**Ray CORBITT, Plaintiff-Appellee,**

v.

**Brent ANDERSEN, in his official capacity and individually, Defendant-Appellant.**

**No. 83–2047.**

United States Court of Appeals, Tenth Circuit.

Dec. 11, 1985.

---

Lawrence G. Orr (Ethelyn Boak Orr & Guy, Williams, White & Argeris, with him on brief), Cheyenne, Wyo., for defendant-appellant.

Charles E. Graves of Graves & Associates, Cheyenne, Wyo., for plaintiff-appellee.

Before LOGAN and McWILLIAMS, Circuit Judges, and BOHANON, District Judge.[*]

McWILLIAMS, Circuit Judge.

This civil rights action arises out of interaction between two practicing psychologists residing in Rock Springs, Wyoming. Dr. Ray Corbitt, who has a doctorate degree in psychology from the University of Wyoming, brought suit under 42 U.S.C. § 1983 in the United States District Court for the District of Wyoming against Dr. Brent Andersen, who has a doctorate degree in psychology from Utah State University. A co-defendant was Southwest Counseling Service, a non-profit Wyoming corporation and a political subdivision of Sweetwater County, Wyoming.

Joined with the § 1983 claim was a pendant claim based on Wyoming law relating to tortious interference with a contractual relationship. Corbitt sought actual damages and punitive damages. Trial by jury resulted in a verdict in favor of Corbitt and

[*] Honorable Luther L. Bohanon, United States District Judge for the District of Oklahoma, sitting by designation.

against Andersen only in a total amount of $111,843, i.e., $68,309 on Corbitt's civil rights claim and $43,534 on his pendant state claim. Judgment was entered, and Andersen now appeals therefrom.

From the complaint we learn that Corbitt was employed in 1977 by School District Number One, Sweetwater County, Wyoming as a school psychologist. From that date to the date when the complaint was filed, Corbitt, with the knowledge and permission of his employer, the school district, rendered professional services during out-of-school hours to private parties for compensation. In this regard, in addition to individual private clients, Corbitt entered into numerous contracts for private treatment of clients within his field of professional expertise with the Department of Public Assistance and Social Services (DPASS) in Sweetwater County, and with the Department of Vocational Rehabilitation (DVR) of the State of Wyoming.

As above stated, the Southwest Counseling service was also a named defendant in the present proceeding, but the jury, by its answers to certain special interrogatories, found for Southwest. Southwest, a non-profit Wyoming corporation funded by state and county funds, was a "competitor" of Corbitt's in the sense that it, too, sought "referrals" from DPASS and DVR. Andersen, the defendant, became the director of Southwest in July, 1979, and the gravamen of the complaint is that immediately thereafter Andersen embarked on a continuing campaign to discredit Corbitt's professional standing and that, as a result thereof, Corbitt was defamed and his private practice of psychology suffered, particularly when DPASS and DVR ceased making referrals to him and began making referrals, which he might have ordinarily expected, to Southwest.

By answer, Andersen generally denied liability, and, at trial, his theory of defense was that under the psychologists' code of professional responsibility he had the duty to "speak out" when he felt that Corbitt was rendering professional services in cases outside or beyond his particular area of expertise. Andersen also argued that although he had relayed to DPASS and DVR, and others, his concerns regarding Corbitt, any cessation, or slowing down, of referrals to Corbitt by DPASS or DVR was not the result of his actions, but resulted from a change of policy within DPASS and DVR.

Trial of this matter took some ten days, during the course of which Corbitt called some fourteen witnesses, and Andersen himself called seven witnesses. The case was then submitted to the jury with a series of special interrogatories. The interrogatories as they related to Andersen were as follows:

1. Do you find, by a preponderance of the evidence, that the Plaintiff, Ray Corbitt, on or after June 24, 1980, had a liberty interest of which he was deprived by any action taken by the Defendant Brent Andersen?

2. If you have found that the Plaintiff was deprived of a liberty interest as a result of Defendant Andersen's actions, and if you further find by a preponderance of the evidence that notice and a hearing would have accorded the Plaintiff due process of law, do you find by a preponderance of the evidence that the Plaintiff was given such notice and a hearing as to constitute due process?

3. Do you find by a preponderance of the evidence that the Defendant Andersen was acting under color of state law with regard to the actions complained of by the Plaintiff?

4. Do you find, by a preponderance of the evidence, that the Defendant Andersen is entitled to immunity from liability for damages arising out of a violation of Plaintiff's civil rights?

5. If you have found that any actions of the Defendant Brent Andersen deprived the Plaintiff of a liberty interest, do you find, by a preponderance of the evidence, that the actions of Defendant Andersen were a proximate cause of any damages suffered by the Plaintiff?

6. Do you find, by a preponderance of the evidence, that the Defendant Brent Andersen, on or after March 29, 1980, intentionally and improperly interfered with any contractual relations involving the Plaintiff and any third parties, which caused any third party to breach a contract with the Plaintiff?

7. If you have found that the Defendant Andersen intentionally and improperly interfered with contracts involving the Plaintiff, do you find, by a preponderance of the evidence, that the Defendant Andersen was acting within the scope of his employment at the time he committed such action or actions?

The jury answered "yes" to interrogatories numbered 1, 3, 5, and 6, and answered "no" to interrogatories numbered 2, 4, and 7. It then assessed Corbitt's damages at $111,843.00. On appeal, Andersen argues, *inter alia*, that there is insufficient evidence to support any of the jury's answers to any of the interrogatories, and further that, in reality, the district judge should have ruled in his favor on each of the interrogatories, as a matter of law. Such is not our reading of the record. We believe the record supports the jury's answers to all the special interrogatories. In a case of this sort, evidence pertaining to ultimate facts is frequently circumstantial in nature, involving the drawing of inferences. Such is the prerogative of the fact finder, not an appellate court.

■ Initially, Andersen argues that Corbitt's civil rights claim is time-barred by Wyoming's two-year statute of limitations. W.S. § 1–3–115. *Spiegel v. School District No. 1, Laramie County, Wyoming*, 600 F.2d 264 (10th Cir.1979). The complaint in the instant case was filed on June 24, 1982. Andersen became director of Southwest in July, 1979, and, according to

Corbitt's theory of the case, shortly thereafter embarked on a campaign to destroy his professional standing. It is Corbitt's position, however, that this was a series of actions on the part of Andersen which continued on after June 24, 1980, which would bring the claim within the two-year period. *See, e.g., Page v. United States*, 729 F.2d 818, 821–22 (D.C.Cir.1984); *Taylor v. Meirick*, 712 F.2d 1112, 1118–19 (7th Cir.1983). The jury was properly instructed on this matter, and the record supports Corbitt's position that Andersen's contacts with others regarding Corbitt's lack of professional expertise and ethics continued after June 24, 1980, and that Corbitt's legal injury, or at least a part thereof, did not occur until after June 24, 1980. We find no error in this regard.\*\*

■ The central issue in this case is whether Corbitt made out a *prima facie* case that a liberty interest had been violated by Andersen's actions. The district judge ruled that Corbitt had failed to establish, *prima facie*, any violation of a property interest, but that the question of a liberty interest should go to the jury. We find no error. In this regard, Andersen relies heavily on *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1975). In that case, the Supreme Court held that a damaged reputation "alone, apart from some more tangible interests such as employment," is neither liberty nor property "by itself sufficient to invoke the procedural protection of the Due Process Clause." *Id.* at 701, 96 S.Ct. at 1160. Under Corbitt's theory of the case, we are dealing with something more than a damaged reputation. The right to pursue one's chosen profession unfettered by state action which does not comport with the 14th Amendment, is referred to in *Schware v. Board of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752,

---

\*\* The instant case was tried before *Garcia v. Wilson*, 731 F.2d 640 (10th Cir.1984), aff'd — U.S. ——, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) and *Jackson v. City of Bloomfield*, 731 F.2d 652, 655 (10th Cir.1984). Under *Garcia*, it would appear that Wyoming's four-year statute would apply to the instant case if it were being tried now. W.S. § 1–3–105(a)(iv)(C). *Jackson* held

that *Garcia* would not be applied retroactively so as to *bar* a civil rights action. In view of our disposition of the statute of limitations issue in the instant case, we need not here decide whether *Garcia* would be applied retroactively so as to *permit* a civil rights action which otherwise would be time barred.

1 L.Ed.2d 796 (1957). Further, under Corbitt's theory of the case, Andersen interfered with his right to contract with DPASS and DVR. In other words, Andersen not only defamed Corbitt, but created a stigma that "foreclosed his freedom to take advantage of other employment opportunities." *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972). We reject the suggestion that this is, at best, only a garden-variety state libel case masquerading as a civil rights case. The jury heard sufficient evidence regarding the initial health and worth of Corbitt's private practice and could reasonably conclude that Andersen's actions weakened and devalued it.

The record, in our view, also amply supports the jury's conclusion that Andersen was acting under color of state law when he went "behind Corbitt's back," as counsel frames it, to DPASS, DVR, the state board of examiners, and others to suggest that Corbitt was not professionally qualified to handle cases. Andersen testified himself that he considered the contacts he made to be part of his job. A former DVR official testified that Andersen's contacts were especially disturbing because of the potential development of *interagency* conflict. His concern was heightened because of Andersen's position as director of Southwest. In addition, Andersen's written communications were executed on Southwest stationery and signed in his capacity as director. One letter, sent to Corbitt's school district supervisor, opened with: "As the director of mental health services for the County, I work with a number of other professionals.... I am very disturbed about some of the practices and skills of Dr. Ray Corbitt...." It was reasonable for the jury to find that Andersen did not present himself as merely a concerned professional or any other respected member of the community, as the dissent suggests, but rather as a person acting under color of state law.

Andersen's communications represent the antithesis of due process, which requires *"some* form of hearing" (*Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982)),

when an individual is to be deprived of a liberty or property interest by state action. Here the jury found reasonably that Corbitt received no due process before accusations regarding his competence and ethics were used to deprive him not only of respect but of employment.

We see no need for any extended discussion concerning the remaining matters raised on appeal by Andersen. Although witnesses differed on Corbitt's qualifications and the causality issue, officials at both DPASS and DVR testified that, as a result of Andersen's complaints, there was a reduction in referrals to Corbitt. Despite state policy favoring mental health centers, other referrals continue to be made by DVR and DPASS to outside psychologists, including Andersen, who has entered private practice. The jury was instructed on the immunity question in accord with *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), and found, in effect, that Andersen, as a reasonable person, should have known that by his action he was violating established constitutional rights. There was no error in this regard.

■ Corbitt's pendant claim involves a consideration of the Wyoming Governmental Claims Act, W.S. § 1–39–104 and the four-year Wyoming Statute of Limitations, W.S. § 1–3–105(a)(iv)(C). We are disinclined to disturb the district judge's application of Wyoming law to the facts underlying Corbitt's pendant claim. The views of a resident federal district judge concerning the local law of his home state are entitled to some deference by an appellate court, whose members are all non-resident of the state in question. *Colonial Park Country Club v. Joan of Arc*, 746 F.2d 1425, 1429 (10th Cir.1984).

■ Pursuant to applicable statute, the district judge awarded Corbitt attorneys' fees and costs in the amount of $46,471.11. 46 U.S.C. § 1988. A prevailing plaintiff in a § 1983 action is ordinarily entitled to attorneys' fees, unless special circumstances would render it unjust. We find no such

special circumstances. *See Love v. Mayor, City of Cheyenne, Wyo.*, 620 F.2d 235 (10th Cir.1980).

Judgment affirmed.

BOHANON, District Judge, dissenting:

Although the majority's opinion in this case is ably and persuasively written, I believe it overlooks some crucial features of this case and therefore I respectfully dissent.

Central to Dr. Corbitt's case is his claim that Dr. Andersen's actions have caused DPASS and DVR to stop making referrals to Dr. Corbitt and thereby have resulted in a denial of his constitutional right to freely practice his profession. (Brief of appellee at 19). It is obvious that this claim presupposes that Corbitt had some legal right to these referrals in the first place. However, Corbitt's own testimony at trial clearly shows that his relationship with DPASS and DVR never rose to the level of an ongoing contract regarding the making of referrals:

Q. Okay. Now with regard to the agency referrals, they were not bound to refer any specific business to you, were they?

A. No.

Q. They weren't bound to refer any business at all to you?

A. No, they were not.

Q. You had no agreement with them or legal contract whereby they obligated themselves to provide you with business?

A. I had some understandings with them, but they had no obligation to fulfill that.

Q. They could do as they wished?

A. Yes.

Q. And so their degree of business to a large extent depended on a lot of different factors, didn't it?

A. I assume it did, yes.

Q. I would depend on their budget, wouldn't it?

A. I'm sure that would affect it, yes.

ROA Vol. VI at 1056. It is obvious from this that Corbitt at least would not have had any cause of action against DVR or DPASS for a refusal to make referrals to him. The directors of these two state agencies, who were not named as defendants in this action, could, acting under color of state law, without any notice or hearing, deprive Corbitt of all the employment from these agencies that Andersen is alleged to have deprived him of, without incurring any liability whatsoever to Corbitt under § 1983 or state law. No one would suggest that such a decision would deprive Corbitt of his right to practice his profession or infringe upon a constitutionally protected liberty interest. There simply was no contract for referrals, no contractual or constitutional *right* to referrals, and the denial of referrals did not in any way prevent Corbitt from seeking business elsewhere.

Let us set aside for the moment careful consideration of what I think is the highly questionable assertion that Andersen was acting under color of state law when he contacted the directors of DVR and DPASS about Corbitt, and presume instead that Andersen had actual legal authority to compel these directors to cease the referrals of patients from their agencies to Corbitt and exercised his authority to that end. In such a hypothetical, Andersen's actions would clearly be under color of law, and if they deprived Corbitt of some right or privilege secured by the Constitution and laws of the United States, Corbitt would be entitled to redress under § 1983. Would Corbitt then have a cause of action against Andersen for the loss of the referrals in this case given his testimony about the lack of an obligatory relationship? Clearly, he would no more have such a claim against Andersen than he would have one against the directors of DVR and DPASS. Without a contract, Corbitt is out of luck. He has no right to due process because he has not been deprived of any legal interest.

At trial, however, the director of the Sweet Water County DVR, Bob Stahl, and the director of the county DPASS, John Anderson, both denied that Andersen had authority over them like that in the hypo-

thetical, or that they believed he had such legal authority at the time of the complained of contacts. Neither state official made reference to any "statute, ordinance, regulation, custom, or usage" of the state of Wyoming that they thought entitled or empowered Andersen to intervene in their decisions regarding the making of referrals. Stahl, in fact, denied that Andersen's contacts with him about Corbitt ever stopped him from making referrals to Corbitt, though he did say they made him more careful to avoid interagency conflict. ROA Vol. IV at 588, 614.

The following portion of Stahl's testimony is revealing:

> Q. If ... Dr. Andersen had not been the head of a governmental body such as Southwest, would your concern have been the same?
>
> A. Well, it certainly probably wouldn't have been as great when a respected and powerful and influential man in the community makes those kinds of allegations, it's certainly—it would be different than somebody walking in off the street. They of course should be considered and investigated but I think somebody in a powerful position would have more through [sic], yes.

*Id.* at 608. Although his response was somewhat disorganized, Stahl's concern does not appear to have been that Andersen had any authority by virtue of his employment by the state, but rather that he was an influential and powerful man in the community. Stahl's response indicates he would have shown the same deference to a well respected minister or businessman and would have considered and investigated even allegations made by an ordinary citizen—as well he should. *Black's Law Dictionary* 241 (5th ed. 1979) uses the following language in defining "under color or of any law" as used in 42 U.S.C. § 1983:

> the unlawful acts must be of such a nature or character, and be committed under such circumstances, that they would not have occurred but for the fact that the person committing them was an official then and there exercising his offi-

cial powers outside the bounds of lawful authority.

Upon the present record, I find no sign that Andersen ever "exercised his official powers" with respect to Dr. Corbitt. All of his actions could have been taken by any other psychologist or member of the public (and indeed the record discloses that others, not named as defendants in this suit, did independently question Corbitt's ethics and expertise even before Andersen became director at Southwest Counseling and quite possibly contributed to the "damages" Corbitt seeks to recover from Andersen alone). What we have here is not the color of law, but at most a mere color of color of law.

Even if reasonable men could differ about whether the facts of this case show the relationship between Andersen and the directors of DVR and DPASS to be tinged with the color of state law, I must question how we can conclude that the vague relationship shown by the record somehow created for Corbitt a constitutional right to the referrals he would not have given the undeniable color of authority on Andersen's part presumed by my hypothetical *supra.*

Reason and common sense indicate that since Andersen would have no liability whatsoever if he himself had made and enforced the decision to terminate referrals, he also has none where he is alleged merely to have influenced the decision. Section 1983 does not grant a remedy for abuse of authority *unless that abuse resulted in harm to a protected right.*

There were other wrongful contacts alleged by Corbitt beside those dealing with DVR and DPASS; however, most of these fare even less well as a basis for a lawsuit under § 1983. Andersen appears to have made some contact by telephone with a member or members of the Wyoming State Board of Psychologists Examiners to determine whether Corbitt was a licensed psychologist and possibly to attempt to initiate some sort of disciplinary proceedings against Corbitt. However, there was simply no evidence or even an allegation that these contacts ever caused Corbitt damage

in any way. In fact the evidence showed that the Board on its own initiative, several months before Andersen became involved at Southwest Counseling or with Corbitt's private practice, had directed questions to Corbitt about the apparent impropriety of his practicing outside his specialty—the very problem that *later* prompted Andersen's concern. The members of the Board, however, were not named as defendants in this action.

There is also evidence that Andersen repeatedly discussed the Corbitt problem at staff meetings within Southwest Counseling. Again, there was no showing that these discussions deprived Corbitt of any employment or otherwise infringed upon his rights except insofar as defamation per se under state law might be applicable. There was also no showing that Andersen's attempt to influence Arlo Niederer, Corbitt's supervisor at School District No. 1, caused any harm to Corbitt. It is undeniable that Corbitt was still employed by the school district at the time of trial and had suffered no decrease in salary or failure to receive scheduled salary raises.

The one contact that could conceivably support a valid claim other than defamation is Andersen's conversation in 1980 with Dr. Abe Hitt, the licensed psychologist who was supervising Dr. Corbitt's work by mail. But before this matter can be discussed, a whole set of facts completely ignored by the majority opinion must be introduced.

Although it is not mentioned in the majority opinion, it was uncontroverted at trial that throughout the period of Dr. Andersen's alleged misconduct toward Dr. Corbitt up to just a matter of days before this case was filed, Dr. Corbitt was not himself licensed as a psychologist under Wyoming state law. Corbitt did have a temporary license in the Spring of 1979; however, this temporary license was revoked in June of that year when he received notice that he had failed his first licensure examination, given in April, 1979. Corbitt received this notice more than a month before Dr. Andersen commenced his official duties at Southwest Counseling. Corbitt also failed

two subsequent examinations before finally passing the exam given in April of 1982. There was not a trace of evidence at trial, nor was there any allegation, that Andersen had anything to do with Corbitt's repeated failure to pass the exam.

The Wyoming statute governing licensure of psychologists, Wyo.Stat. § 33–27–102 (1977) provides in pertinent part as follows:

(a) License required.—Any person who, individually or as a member or employee of a firm, partnership, association, corporation or institution, holds himself to be a psychologist and uses a title or description of services which incorporates the word "psychological," "psychologist," or "psychologic" or "psychology" and renders services for compensation or other personal gain involving the application of principles, methods, procedures of the science and profession of psychology, shall hereafter be licensed under the terms of this act [§§ 33–27–101 to 33–27–112].

.    .    .    .    .

(c) Persons working under supervision of licensed psychologist.—Nothing in this act shall prevent the employment by [sic] a person, association, partnership or corporation furnishing psychological services under the provision of this act to perform services in various capacities as needed, if such persons work under the supervision of a psychologist licensed under the provisions of this act and if such persons are not in any manner held out to the public as psychologists licensed under the act.

I have been unable to find any cases interpreting this statute. The common understanding among persons in the field, as evidenced by the testimony at trial, appears to be that the only thing a licensed psychologist may do that an unlicensed psychologist may not is use the term "psychologist" in referring to himself or herself. However, an exhibit in the record shows that on October 3, 1979, the Wyoming Department of Health and Social Services issued a policy statement to county DPASS offices di-

recting that after January 1, 1980, such offices could purchase psychological evaluations *only by licensed psychologists or by persons acting under the supervision of a licensed psychologist.* There was some disagreement among the witnesses at trial about what sort of supervision is adequate under § 33–27–102(c).

After Corbitt failed his first licensure examination in 1979, he sought and obtained an arrangement with Dr. Hitt whereby Corbitt would continue to do psychological testing and evaluation for DVR and DPASS but would send his reports to Dr. Hitt who would sign off on them as the supervising psychologist before they were returned to the agencies. Dr. Hitt lived in Thermopolis, Wyoming, some 150 to 200 miles from Rock Springs where Corbitt was practicing. In January of 1980, Dr. Hitt, having learned for the first time that Corbitt had failed a licensure examination (actually his second, given in October, 1979) became concerned and insisted that a formal supervisory contract be formed to replace the "token supervision" that he had given Corbitt before.

Dr. Andersen had some knowledge of the arrangement between Hitt and Corbitt and, sometime in 1980, mentioned to Dr. Hitt at a convention the concerns he had regarding Corbitt's practice, including the fact that charges of sexual misconduct, possibly unfounded, had been made against Corbitt by one of his clients. Dr. Hitt testified at trial that he thought Andersen's contacting him was entirely proper and gave him (Hitt) information he definitely needed to know. Sometime later Hitt terminated his supervising arrangement with Corbitt. Dr. Hitt testified that Corbitt had never contacted him for supervision after the contract was signed and when Corbitt after several months sent Hitt a check for $100, Hitt

returned the check. Hitt said that he terminated the arrangement because he "didn't know what [Corbitt] was doing" and decided he "couldn't possibly supervise him from that distance." ROA Vol. VII at 138, 140. He denied that his decision had anything to do with Dr. Andersen's contact. *Id.* at 180. The record does not show that Corbitt has ever sought damages from Hitt for breach of the supervision contract.

Although the evidence in the record strongly suggests that Andersen did not cause Corbitt to lose the benefit of Dr. Hitt's supervision, it would be appropriate to allow the trier of fact to determine the credibility of the witnesses with regard to this issue of causation. The matter of damages is more dubious, however.

The trial court appears to have accepted the common understanding of § 33–27–102 in interpreting the statute for the benefit of the jury in the instructions.[1] Under that interpretation, it appears that so long as Corbitt did not hold himself to be a "psychologist" he could do anything his practice entailed without needing a license or supervision, except the state agency referrals, for which as noted *supra,* there was a separate regulatory requirement. Indeed, I have been unable to find any indication in the record that Dr. Hitt was used for any other part of Corbitt's business. If the loss of DVR and DPASS business was the only consequence for Dr. Corbitt of Dr. Hitt's decision to terminate the supervision agreement (and given Hitt's testimony it appears Corbitt had either already lost this business before Hitt terminated or was conducting it without actual supervision), then again, since Corbitt had no enforceable right to these referrals in the first place, it is difficult to see how the loss of Dr. Hitt's supervision could have amounted to a constitutional deprivation.

---

1. Instruction No. 15 read:
   You are instructed that the Psychologist Licensing Law of Wyoming requires those persons who hold themselves to be psychologists and receive payment to be licensed.
   The law makes exceptions for persons who provide services under the supervision of licensed psychologists, and for persons who are certified as school psychologists, and does not require them to be licensed.
   You are further instructed that persons in Wyoming who are not licensed and who do not hold themselves to be "Psychologists" may perform counseling, testing, and other mental health services for compensation without restriction.

I have also been unable to find any evidence that would support a conclusion that Anderson was acting under color of law when he contacted Hitt. The contact was, rather, casual in character, occurring at a state-wide mental health center director's meeting. ROA Vol. VII at 138–139. The two men met as equals, and there was no suggestion of an authority relationship.

The majority opinion places strong reliance on *Schware v. Board of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) and correctly notes that "[t]he right to pursue one's chosen profession unfettered by state action which does not comport with the Fourteenth Amendment, is referred to in" that case. *Supra* 778 F.2d at 1474. The reference noted, however, was made in a vastly different context. *Schware* involved a decision by the Board of Bar Examiners of New Mexico to refuse to permit an applicant to take that state's bar examination because he allegedly lacked "good moral character." The decision of the Board completely precluded Schware from engaging in any practice of law in that state whatsoever. The "right to pursue one's chosen profession" in question was *not* the right to be employed by whatever individual clients one desires free of any peer criticism about one's expertise or ethics, but rather the right to practice at all in a state in a given professional field.

Circumstances are much different in this case. Here Corbitt was not impeded in any way from taking the professional licensure examination of his choosing. He was in fact permitted to take it four times, and when he finally passed it he was promptly licensed and given all the privileges of other licensed members of his chosen profession, privileges he enjoys to this day. Furthermore, even before he was licensed, if we are to accept the trial court's interpretation of Wyoming law, Corbitt was free to perform all the services of a licensed psychologist, and receive compensation therefor, so long as he did not refer to himself as a "psychologist." There was therefore clearly no wrongful state action of the kind before the court in *Schware*. Even if we accept that Andersen's actions were "state action" in the sense intended by the majority opinion, there is absolutely no evidence in this record that the actions prevented Corbitt from practicing his chosen profession for any clients other than those that might have been referred by DVR and DPASS.[2]

Given these circumstances, I feel that the majority opinion too lightly passes over the following language from *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1975).

> The words "liberty" and "property" as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law. While we have in a number of our prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause.

In this case Corbitt lost no employment but only some possible referrals that DVR and DPASS were not obliged to give him and may not have been legally empowered to give him. Possible employment is not employment. In *Paul v. Davis* the respondent had partially grounded his claim of deprivation of a constitutional "liberty" interest upon an assertion that circulation by police of a flyer naming him an "active shoplifter" would "seriously impair his fu-

---

2. Corbitt claimed and presented evidence that the loss of these referrals caused him emotional problems that forced him to close his practice; however, one cannot create a cause of action under § 1983 by getting upset about something otherwise not actionable.

ture employment opportunities." *Id.* at 697, 96 S.Ct. at 1158. Despite this allegation, the High Court found the respondent stated no claim under § 1983, but only a case of defamation per se under state law. In like manner, and directly contrary to the view of the majority of this panel, I feel that this case is indeed nothing more than a state law defamation case in § 1983 clothing.[3] The only actionable injury that Corbitt may have suffered to his ability to practice his profession as a result of Andersen's conduct was a loss of professional reputation which was questioned even *before* Andersen came onto the scene.

Corbitt had no contractual right to the referrals; the referrals did not constitute the totality or even the major part of his professional practice; the decision to terminate the referrals was made by independent state officials who were not subject to Andersen's official powers under any statute, ordinance, regulation, custom, or usage of the State of Wyoming; other persons, including members of the State Board of Psychologist Examiners, acting independently of Andersen, had questioned Corbitt's qualifications to engage in the type of practice entailed by the referrals; and Corbitt, through no fault of Andersen, demonstrated by flunking the licensure examination three times during the period of the alleged constitutional deprivation that he was not yet *qualified* to be a professional psychologist. I believe that extending § 1983 protection to these circumstances by affirming the trial court's judgment cre-

ates a very confusing and dangerous precedent for the law of licensed professions and amounts to a miscarriage of justice. Clearly, the least that can be said is that there is a debatable question *of law* about whether Andersen violated Corbitt's constitutional rights. To hold, therefore, as the majority opinion does, that the jury could find as a matter *of fact* "that Andersen, as a reasonable person, should have known that by his action he was violating established constitutional rights" is absurd and ridiculous.

For many of the same considerations presented *supra,* I find that the trial court's award of $43,534 damages for tortious interference with contract was also wholly unsupported by the record. There being no basis for relief under § 1983 or the United States Constitution, no claim for relief under any other federal statute, and no diversity of citizenship among the parties, I would vacate the judgment and dismiss Corbitt's complaint, leaving him to seek whatever relief he may be entitled to under state law in the appropriate forum.

---

**3.** It is true that some authorities recognize the tort of "interference with prospective advantage" or "intentional interference with prospective contractual relation." W. Prosser, *Law of Torts* § 130 (4th ed. 1971); *Restatement (Second) of Torts* § 766B (1979). I do not believe such a claim could be maintained upon the record in this case. In any event, the Court in *Paul v. Davis* specifically held that § 1983 does not provide a remedy for every tort committed by a state or its agents:

> [Respondent] apparently believes that the Fourteenth Amendment's Due Process Clause should *ex proprio vigore* extend to him a right to be free of injury wherever the State may be characterized as the tortfeasor. But such a

reading would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States. We have noted the "constitutional shoals" that confront any attempt to derive from congressional civil rights statutes a body of general federal tort law, *Griffin v. Breckenridge,* 403 U.S. 88, 101–02 [91 S.Ct. 1790, 1797–98, 29 L.Ed.2d 338] (1971); *a fortiori,* the procedural guarantees of the Due Process Clause cannot be the source for such law.

*Paul v. Davis,* 424 U.S. at 701, 96 S.Ct. at 1160. The Court plainly denied relief under § 1983 for loss of possible future employment in that case and we should do likewise here.