**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 8 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RAYMOND J. DRAKE,

      Plaintiff-Appellant,

v.

COLORADO STATE UNIVERSITY;
COLORADO STATE BOARD OF
AGRICULTURE; COLORADO
STATE UNIVERSITY POLICE
DEPARTMENT; DONN HOPKINS, as
Police Chief of the Colorado State
University Police Department and in
his individual capacity; KARL
SWENSON, as a Police Officer of the
Colorado State University Police
Department and in his individual
capacity; and GENE KIRBY, as a
Police Officer of the Colorado State
University Police Department and in
his individual capacity,

      Defendants-Appellees.

No. 97-1076
(D.C. No. 91-K-382)
(District of Colorado)

_____

RAYMOND J. DRAKE,

      Plaintiff-Appellant,

v.

No. 97-1077
(D.C. No. 90-K-2178)
(District of Colorado)

CITY AND COUNTY OF DENVER;
DENVER POLICE DEPARTMENT;
THOMAS COOGAN, as Police Chief
of the Denver Police Department and
in his individual capacity; CHESTER
BRANNAN, as a Police Officer of the
Denver Police Department and in his
individual capacity; DOUGLAS
HILDEBRANT, as a Police Officer of
the Denver Police Department and in
his individual capacity; DIXIE
GRIMES, as a Police Officer of the
Denver Police Department and in her
individual capacity; and RUTH
POTTER, as a Police Officer of the
Denver Police Department and in her
individual capacity,

      Defendants-Appellees.

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, **McKAY**, and **EBEL**, Circuit Judges.

Plaintiff-appellant Raymond J. Drake ("Drake") brought a Title VII

retaliation and discrimination suit against defendants-appellees Colorado State

University ("CSU"), the Colorado State Board of Agriculture, the CSU Police

Department (the "CSUPD"), and various CSU employees after CSU refused to

---

    * This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

hire Drake as a campus police officer. In a separate action, Drake sued his former employer, defendants-appellees the Denver Police Department (the "DPD"), and various DPD employees under Title VII for providing a negative job reference to CSU in retaliation for Drake's past history of filing discrimination suits. Drake also brought a defamation suit under 42 U.S.C. § 1983 against one of the defendants-appellees Ruth Potter ("Potter"), a Denver police officer who provided background information to CSU about Drake's performance at the DPD. In one order addressing the two cases, the district court granted summary judgment against Drake on all of his claims. Drake now appeals. We dispose of both appeals in a single order & judgment and      affirm.

## BACKGROUND

Drake is an adult African-American male.[1] Drake worked as a police officer for the DPD from 1974 until he resigned from the force in 1981. During his term as a Denver police officer, Drake conducted off-duty, unofficial inquiries into racism at local nightclubs. In 1978, the Glendale Police Department arrested Drake for felony menacing after he drew his gun during an off-duty visit to a nightclub as part of his racism investigations. The charges against Drake

---

[1] Because Drake challenges the grant of summary judgment against him, we present the evidence in the light most favorable to him as the non-moving party. See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). However, we accept as true all evidence offered by the defendants-appellees uncontested below by Drake. See id.

eventually were dismissed, and he received an undisclosed amount of money from the club in a court settlement. The DPD took no disciplinary action against Drake as a result of this, or any other, incident.

In his 1981 resignation letter, Drake wrote that he had not "exerted much effort" towards the end of his term as a Denver police officer and that he had "developed a negative attitude toward my profession due to the fact that most of the laws appear to be designed for the average criminal and not in the interest of the average victim." He also stated that he had "various other reasons" that prompted his decision to resign, but added that they were too "numerous to mention." After his resignation, Drake applied for a position with the Vail Police Department. He filed a discrimination suit against Vail when it refused to hire him.

In 1983, Drake submitted a request for reinstatement to the DPD. The rules and regulations of the City Civil Service Commission allow for the reinstatement of former officers only "under exceptional or emergency circumstances and only if . . . the applicant possesses special qualifications." In June of that year, the DPD's Technical Service Division recommended against reinstating Drake. The Civil Service Commission decided to seek additional information regarding Drake's request and initiated a background investigation after informing Drake.

Defendant-appellee Dixie Grimes ("Grimes"), a Denver police officer, conducted the background investigation. Grimes solicited written memoranda regarding Drake from fellow officers and defendants-appellees Chester Brannan ("Brannan"), James Lindsey ("Lindsey"), and Douglas Hildebrant ("Hildebrant"), all of whom recommended that Drake not be rehired because he had negative attitudes towards work and posed a supervisory problem. The Civil Service Commission subsequently denied Drake's reinstatement request. Drake responded by challenging the statements made in the memoranda submitted by Brannan, Lindsey, and Hildebrant. Drake found work with the Larimer County Sheriff's Department in 1983 until he voluntarily resigned in 1986.

In March of 1989, Drake applied for the position of patrolman with the CSUPD. Drake met all of the requirements for the position as listed in the job announcement. Donn Hopkins ("Hopkins"), the chief of police for CSU, assigned Karl Swenson ("Swenson") and Eugene Kirby ("Kirby") to perform a background investigation on Drake. Kirby telephoned defendant-appellee Ruth Potter ("Potter"), a Denver police officer, to gather information about Drake's performance at the DPD. Potter recounted Drake's unsuccessful attempt at reinstatement and told him that Drake "was involved with an incident in Glendale

. . . and he was allowed to resign" from the department. Potter stated that charges would have been filed against Drake by the DPD had he not resigned.[2]

Kirby contacted an unidentified individual with the Glendale Police Department about Drake's 1978 arrest based on information provided by Drake in his application. Kirby also contacted the Larimer County Sheriff, who described Drake as an excellent cop but added that Drake had a propensity for civil suits and was paranoid in reference to racial problems.

CSU arranged for Drake to take a polygraph examination from the Fort Collins Police Department because CSU did not have an independent polygraph capability. Upon contacting the Fort Collins Police Department, Sergeant Vagge of Fort Collins informed Kirby that Drake was suing the city of Fort Collins and the Fort Collins Police Department and that Drake had suits pending or had filed suits against the Loveland and Vail Police Departments. Drake was then interviewed along with other candidates for the CSU position. After Swenson asked Drake during the interview about the employment discrimination complaints he had filed, Drake repeatedly brought the subject up for discussion, arguing that he had been justified in filing the suits and strongly defending his past conduct.

_____

[2] Potter denies making any of these statement and denies ever discussing Drake with any CSU officials.

In May of 1989, Swenson wrote a letter to the CSU Personnel Department recommending that the position be awarded to a non-minority candidate and asking that Drake's name be removed from the department's eligibility list. Swenson expressed concern over the Glendale incident and the liability issues it raised. Swenson also noted that Drake's interview lasted twice as long as other interviews because Drake repeatedly rehashed the Glendale incident and his past lawsuits. Swenson concluded that Drake ranked sixth out of the six interviewed candidates. CSU then selected the non-minority candidate for the job and informed Drake of the decision.

In June of 1989, Drake applied for a second opening on the CSU police force. Hopkins and Swenson interviewed Drake along with three other candidates. On July 24, 1989, Hopkins sent a memorandum to Dana Hiatt ("Hiatt"), CSU's Equal Opportunity Office Director, describing the results of the interviews and recommending a non-minority candidate for the job. Hopkins ranked Drake below the other candidates, stating that Drake was "extremely nervous" and had given a "lackluster" performance. Hopkins added that Drake's career aspirations were unrealistic and expressed concern about Drake's "inability to get along with co-workers in two previous police jobs" and the fact that he labeled "himself as a trouble maker."

At first, Hiatt refused to approve the non-minority candidate, arguing that Hopkins had not provided sufficient reason for not hiring Drake given CSU's interest in increasing diversity in its police department. On August 17, 1989, Hopkins submitted a detailed memorandum explaining his reasons why Drake "should not be hired just for diversity purposes as he is not the best available candidate." Hopkins wrote:

> He did not perform as well as other candidates and creates serious concerns in regard to his qualifications, background information, problems with judgment and supervision and propensity for personal investigations that stimulate civil actions.

Hopkins noted that the CSUPD "strives to recruit and hire minority candidates qualified for full time career and part time positions. . . . Responding to the diversity issue of students and staff is critical to the success of the department fulfilling its mission." The memorandum listed a number of reasons why Drake should not be hired, including his lackluster showing during the interview, a feeling that Drake "did not have a realistic understanding of the job environment," and the information received during the background checks that indicated Drake had poor judgment as an officer. Satisfied with Hopkins' memorandum, Hiatt approved the non-minority candidate for the job.

Drake immediately filed a formal complaint with CSU's Equal Opportunity Council (the "Council"). The Council held a hearing and issued a finding that no direct evidence supported Drake's claims of discrimination. However, the

Council also found that the hiring process "lacks integrity" and that many "crucial steps in the hiring process were not documented and cannot be accounted for by those in positions of responsibility, i.e., Chief Hopkins and his supervisees, Sgt. Kirby and Lt. Swenson." The Council called the process "sloppy" and concluded that it contained "inconsistency in the scoring process at the oral interviews," and "inconsistency in the tabulating of scores of candidates from the CSUPD oral interview board."

Drake was disqualified from further consideration by CSU when he refused to sign a release form allowing CSU to perform background investigations after he applied for a third position with the CSUPD. Drake had inserted the words "to not" in front of the word "release" on the form.

Drake filed a civil action against CSU, the Colorado State Board of Agriculture, the CSUPD, and against Hopkins, Swenson, and Kirby, both in their individual and official capacities (collectively the "CSU Defendants").[3] Drake alleged four causes of action against the CSU Defendants: 1) violation of the First Amendment; 2) violation of the Fourteenth Amendment; 3) racial discrimination and retaliation in violation of Title VII and 42 U.S.C. §§ 1981 and 1983; and 4) conspiracy in violation of 42 U.S.C. §§ 1983, 1985, and 1986.

---

[3] The action against the CSU Defendants forms the basis of appeal No. 97-1076.

- 9 -

Drake also filed a civil action against the City and County of Denver, the DPD, and Denver Police Chief Thomas Coogan and officers Lindsey, Brannan, Hildebrant, Grimes, and Potter, both in their official and individual capacity (collectively the "City Defendants").[4] Drake's final amended complaint asserted four causes of action against the City Defendants:  1) violation of his Fourteenth Amendment rights to due process by refusing to reinstate him; 2) violation of 42 U.S.C. §§ 1981 & 1983 by impeding his ability to work; 3) engaging in an ongoing conspiracy against him in violation of 42 U.S.C. § 1983, 1985, and 1986; 4) racial discrimination against him in violation of Title VII.  Finally, Drake brought a defamation claim under 42 U.S.C. § 1983 against Potter, Denver, and the DPD for providing a negative job reference to CSU in 1989.

Drake initially proceeded pro se, but counsel was appointed for him.  Both the City Defendants and the CSU Defendants moved for summary judgment on all of Drake's claims, which the district court granted on January 30, 1997.  Drake now appeals summary judgment on 1) his discrimination and retaliation claims against the CSU Defendants, 2) his Title VII retaliation claim against the City Defendants, and (3) his § 1983 defamation claim against Potter.

---

[4]  The action against the City Defendants forms the basis of appeal No. 97-1077.

**DISCUSSION**

We have jurisdiction under 28 U.S.C. § 1291 and Fed. R. App. P. 4(a).  We review the grant of summary judgment de novo, using the same legal standard as the district court and taking the evidence in the light most favorable to the non-moving party.  See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).

## I.  97-1076 – Claims against CSU

### A.  Discrimination

The CSU Defendants conceded that Drake has established a prima facie case of discrimination under Title VII:  he is a member of a protected group; he applied and was qualified for the CSUPD job; he was rejected; and a non-minority applicant filled the position.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  As a result, the burden shifted to the CSU Defendants to articulate some legitimate, non-discriminatory reason for the adverse employment decision.  See id.  The CSU Defendants met this burden by producing the August 17 memorandum listing Hopkins' reasons for refusing to hire Drake, reasons that taken as true permit the conclusion that CSU had a non-discriminatory reason for the adverse action.

Consequently, the presumption of discrimination disappeared and the burden shifted back to Drake to present sufficient evidence that a reasonable jury could find that CSU's proffered legitimate reasons for refusing to hire Drake were

- 11 -

merely pretexts.  See id. at 804; Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995).  At summary judgment, Drake could have met this burden either by presenting direct evidence of discrimination or by presenting circumstantial evidence showing that CSU's proffered reasons for refusing to hire Drake are "unworthy of belief."  See Randle, 69 F.3d at 451-53.  The district court found that Drake failed to meet this burden.

Drake presented no direct evidence of discrimination.  Instead, he argues that a statement in the August 17 memorandum by Hopkins that Drake "indicated a high sensitivity to his race" constituted sufficient circumstantial evidence of discrimination.  While Hopkins mentioned the word "race," Hopkins did not argue the Drake should be denied employment because of his race.  Rather, Hopkins expressed concern over Drake's "sensitivity" to his race, a sensitivity that Hopkins feared would result in inappropriate action by Drake as a campus police officer in response to situations involving students of different races.  Hopkins could not be sure that Drake would exercise appropriate professional judgment in such cases, especially given the Glendale incident, Drake's unrealistic understanding of the role of a campus police officer, and his poor interviewing demeanor.  While inartfully worded, such a concern does not amount to discrimination on the basis of race.

Drake needed to present some evidence, either direct or circumstantial, suggesting discriminatory intent or casting doubt on the legitimacy of CSU's proffered explanations. This Drake failed to do. For example, although Drake presented evidence that CSUPD's hiring practices were sloppy and inconsistent, such evidence does not sufficiently rebut as pretextual the legitimate reasons proffered by CSU.

## B. Retaliation

The same burden-shifting approach set forth above in the discrimination context applies to retaliation claims. See Purrington v. University of Utah, 996 F.2d 1025, 1033-34 (10th Cir. 1993). Even assuming that Drake established a prima facie case of retaliation,[5] CSU met its burden by producing Hopkins' August 17 memorandum articulating legitimate, non-discriminatory reasons for

---

[5] Drake arguably showed that he suffered an adverse employment decision subsequent to engaging in protected activity and showed a causal connection between CSU's knowledge of the protected activity and its refusal to hire him. Although such a showing is normally sufficient to establish a prima facie retaliation claim, see Purrington, 996 F.2d at 1033-34, this case involves an added twist because Drake is suing CSU only as a prospective employer and the alleged protected activity was directed at prior, unrelated employers. However, because we find that Drake did not present sufficient evidence of retaliatory motive to rebut the legitimate reasons offered by CSU for its refusal to hire Drake, we do not address whether a plaintiff can maintain a retaliation claim against a defendant even though the antecedent protected conduct was directed at a different employer.

the adverse employment decision. Thus, Drake bears the burden of showing that CSU had a retaliatory motive in not offering him the job. See id.

Drake points to one part of Hopkins' memorandum in support of his retaliation claim, where Hopkins wrote:

> It was stated in one interview by Mr. Drake that he would tolerate prejudice while in uniform because he was being paid to take it, but he would take civil action regarding prejudice out of uniform. I cannot be sure what he would consider on or off duty prejudice, although neither is appropriate and should not occur! He has the right to pursue civil remedies where he feels he was treated illegally; however, I would think it would be irresponsible for me to hire someone who has the propensity to be frequently embroiled in civil actions and the controversy stimulated by those actions.

Drake contends that Hopkins' concerns about Drake's "propensity to be frequently embroiled in civil actions" is sufficient evidence of retaliation to withstand summary judgment. However, Drake does not provide any evidence to show that this comment refers to the past Title VII suits Drake filed against various employers. In fact, Hopkins made that statement while noting that Drake "would take civil action regarding prejudice out of uniform." Placed in context, the statement does not refer to past Title VII suits. Rather, Hopkins expressed concern over Drake's intention to file civil suits in the future against other private entities and the impact such litigation would have on the operations of the

- 14 -

CSUPD and on Drake's ability to perform the job.[6]  Hopkins did not criticize but rather affirmed Drake's right to take advantage of Title VII protections.  Thus, Hopkins' statements do not constitute sufficient evidence of retaliatory motive.[7]

## II.  97-1077 – Claims against the City

## A.  Retaliation

Drake also appeals the grant of summary judgment for the City Defendants on his Title VII retaliation claim.  An employee may bring a cause of action against a former employer under Title VII for retaliatory post-employment actions, see Robinson v. Shell Oil Co., 519 U.S. 337, 117 S. Ct. 843, 848-49 (1997), including providing negative job references.  In order to establish a prima facie case of retaliation, Drake must show that (1) he engaged in protected activity, (2) the DPD took adverse action subsequent to the protected activity, and

---

[6]  In addition, we note that any suits Drake filed under civil rights sections other than Title VII would not necessarily be protected under the Title VII retaliation provision.  See 42 U.S.C. § 2000e-3(a) (making unlawful discrimination because an employee made a charge "under this subchapter.")

[7]  The district court also granted summary judgment against Drake on his § 1981 and § 1983 claims against the CSU Defendants.  Because we find that the district court properly granted summary judgment on Drake's Title VII claims against the CSU Defendants, we also necessarily conclude that the district court did not err by disposing of his § 1981 and § 1983 claims.  See Drake v. City of Fort Collins, 927 F.2d 1156, 1162 (10th Cir. 1991) ("Cases establish that, in racial discrimination suits, the elements of a plaintiff's case are the same, based on the disparate treatment elements outlined in McDonnell Douglas, whether that case is brought under §§ 1981 or 1983 or Title VII. . . .  Because the plaintiff's Title VII disparate treatment and disparate impact claims failed, so would his claims under §§ 1981 and 1983.").

(3) a causal connection exists between the protected activity and the adverse action. See Purrington, 996 F.2d at 1033-34.

Here, Drake failed to produce any evidence that would support an inference of a causal connection between the alleged retaliatory conduct and the claimed protected activity. Thus, we do not need to address the first two factors. Drake offers no direct evidence of a retaliatory causal connection, so he is forced to assert an inference of retaliatory motive that occasionally may be drawn from adverse action that closely follows protected conduct. See Candelaria v. EG & G Energy Measurements, Inc., 33 F.3d 1259, 1262 (10th Cir. 1994). However, the 1989 telephone conversation the DPD had with CSU officials occurred several years after Drake filed his Title VII complaints.[8] Such a lapse in time is too long to provide the required causal connection. See id.; Burrus v. United Tel. Co. of Kansas, Inc., 683 F.2d 339, 343 (10th Cir. 1982).

## B. Defamation

---

[8] Again, we note that this defendant was not the employer against whom Drake filed a Title VII complaint. We do not decide whether a plaintiff may state a retaliation cause of action where the plaintiff's protected conduct was not directed at the employer charged with taking retaliatory action.

Drake brought his defamation claim against Potter under 42 U.S.C. § 1983. The district court concluded that Drake did not offer sufficient evidence of a § 1983 violation.[9]  We agree.

In order to succeed on his § 1983 defamation claim, Drake must show both that Potter's statements stigmatized or otherwise damaged his reputation and that the reputational damage "'was entangled with some other "tangible interest such as employment."'"  Ewers v. Board of County Comm'rs, 802 F.2d 1242, 1247 (10th Cir. 1986) (quoting McGhee v. Draper, 639 F.2d 639, 643 (10th Cir. 1981)) (further citation omitted); see also Paul v. Davis, 424 U.S. 693, 701-02, 711-12 (1976) (constitutional due process deprivation under § 1983 requires showing of damage to property or liberty interest in addition to damage to reputation).  Drake claims that he suffered damage to his liberty and property interests because his job prospects with CSU were impaired by the disclosure of inaccurate information from his personnel file, citing Corbitt v. Andersen, 778 F.2d 1471 (10th Cir. 1985).  In Corbitt, Corbitt, a psychologist, sued another psychologist who, acting as a state agent, allegedly made defamatory statements about Corbitt that caused two state agencies to cease referring clients to Corbitt.  See id. at 1473.  This

---

   [9]  The district court also found that Drake failed to address Potter's qualified immunity defense.  Because we find that Drake did not present sufficient evidence of a § 1983 violation, we need not address the qualified immunity issue.

- 17 -

court held that Corbitt alleged a sufficient deprivation of his constitutional rights because a stigma had been attached to him that "'foreclosed his freedom to take advantage of other employment opportunities.' . . . The jury heard sufficient evidence regarding the initial health and worth of Corbitt's private practice and could reasonably conclude that [the defendant's] actions weakened and devalued it." Id. at 1475 (quoting Board of Regents v. Roth, 408 U.S. 564, 573 (1972)).

However, subsequent Tenth Circuit opinions have limited the holding in Corbitt to the specific facts of that case, noting that Corbitt extended "the concept of a liberty interest to its maximum permissible limit." Setliff v. Memorial Hosp. of Sheridan County, 850 F.2d 1384, 1397 n.18 (10th Cir. 1988); see also Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1269 (10th Cir. 1989) ("This court has made it clear since Corbitt that damage to 'prospective employment opportunities' is too intangible to constitute a deprivation of a liberty or property interest.") (quoting Setliff, 850 F.2d at 1397 n.18). Specifically, the court in Setliff found that the holding in Corbitt was based on the fact that Corbitt showed losses to the "tangible interest" of his existing practice and not the more intangible loss of "prospective employment possibilities." Setliff, 850 F.2d at 1397 n.18. Although the Supreme Court in Paul, 424 U.S. at 701, recognized that injury to employment may constitute a cognizable constitutional deprivation:

- 18 -

> [C]ircumstances which make an employee somewhat less attractive to employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of liberty. . . . [A] liberty interest is not implicated merely by a reduction in an individual's attractiveness to potential employers. . . . A liberty interest is not implicated where the charges merely result in reduced economic returns and diminished prestige, but not permanent exclusion from or protracted interruption of employment.

Setliff, 850 F.2d at 1396-97 (internal quotations and citations omitted). Potter's negative recommendation did not cause any cognizable constitutional deprivation under § 1983. Because Drake has alleged nothing more than the loss of a potential employment opportunity, Drake cannot satisfy the constitutional deprivation prong of his § 1983 claim.

## CONCLUSION

For the reasons discussed above, we AFFIRM the district court's rulings.

ENTERED FOR THE COURT


David M. Ebel
Circuit Judge