Craig PINDELL, Plaintiff,

v.

Marie WILSON–McKEE, Karyl Robb, Gary Stephenson, and Patrick Green, Defendants.

No. 99–CV–07–J.

United States District Court, D. Wyoming.

Aug. 17, 1999.

Stephen H Kline, Kline & Jenkins, Cheyenne, WY, Richard C Slater, Bayless & Slater Law Firm, Cheyenne, WY, for Craig Pindell, plaintiff.

Francisco L Romero, J Murry Shaeffer, Wyoming Attorney General, Cheyenne, WY, for Marie Wilson–McKee, Karyl Robb, Gary Stephenson, Patrick Green, defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ALAN B. JOHNSON, Chief Judge.

### I

This matter is before the court on defendants' Motion for Summary Judgment. Plaintiff brings his Complaint pursuant to 42 U.S.C. § 1983 alleging that defendants violated his liberty interests in his integrity, reputation, and employment and his property interest in his employment without due process when they sent a letter to his new employer falsely accusing him of deleting files when he voluntarily left his state employment. He contends their letter caused him to lose his required security clearance and therefore lose his job at a nuclear power plant. Defendants move for summary judgment on the basis of qualified immunity. Plaintiff's claims against defendants in their official capacities were dismissed on May 19, 1999.

### II

Viewing the evidence in the light most favorable to plaintiff as the party opposing summary judgment reveals the following: Plaintiff Craig Pindell worked for the Department of Commerce, State of Wyoming as a Cultural Resources Specialist I in the Archives Division from August 13, 1995 through March 6, 1998. His primary job was curation of historic photographs. He handled his job competently and there were no complaints or problems with his job performance. Defendant Marie Wilson–McKee was plaintiff's supervisor. Plaintiff had worked for the state for three prior periods, also without any problems or complaints about his job performance. Ms. Wilson–McKee was instrumental in hiring plaintiff each time he was employed by the State.

Defendant Karyl Robb is Ms. Wilson–McKee's immediate supervisor. Non-party Laura Blair is the head of the computer specialist department for the Department of Commerce. Defendant Gary Stephen-

son is the Department's operations manager. Defendant Pat Green is in charge of Human Resources for the Department.

On March 2, 1998, plaintiff e-mailed Ms. Wilson–McKee that he had something important to discuss with her. He intended to tell her of his decision to leave. Ms. Wilson–McKee put plaintiff off for a few days until the morning of March 6, 1998, when plaintiff finally was able to meet with her and tell her he was leaving. Plaintiff told Ms. Wilson–McKee that he was leaving immediately to take a job as a pipefitter/welder at a nuclear power plant located in Omaha, Nebraska. She asked him to stay long enough to show other employees how to disassemble some expensive equipment for the purpose of packing and moving. At the time the department was involved in moving from its temporary headquarters back into its renovated building. Plaintiff agreed to this request and left after it had been accomplished.

As part of his duties with the state plaintiff used a personal computer (PC) located on his desk. Plaintiff used the computer to create a two-page inventory (the inventory) of photographic equipment for his own use at his job. He made several hard copies of the inventory and gave one to the state employee—Tony Adams—who was responsible for all of the inventory for the state archives. An electronic copy was in the Department's file server under plaintiff's directory when he left. On the day he left plaintiff accessed his personal computer only to prepare his resignation letter.

While he was employed by the State plaintiff and another employee had been assigned to create a web page. As part of this project, they casually discussed with Ms. Wilson–McKee the possibility of downloading a demonstration program called "Hot Dog" from the Internet for use in creating the Web page. Plaintiff did not actually download the Hot Dog program to his PC because at the time he left, the project had not progressed far enough to be able to use such a program.

At the time plaintiff left, although plaintiff had never downloaded a copy to his PC, the Hot Dog program was generally available at the Department. For example, Ms. Blair, the computer person for the Department knew that at all relevant times a copy of Hot Dog was available from the Department's web server where it had been long-installed as part of the Department's programs relating to the Internet.

When he left employment with the State, plaintiff left all of his back-up discs in his desk drawer. The back-up files contained copies of all of his files as of the time he left.

Plaintiff did not leave Ms. Wilson–McKee a specific telephone number or address where he could be contacted in Omaha. However, she did not ask him for information on how he could be reached. Neither did she ask plaintiff for any information regarding any of his files or the inventory.

Plaintiff's new job at the Fort Calhoun Nuclear Power Station in Omaha, Nebraska was not a permanent job, but was to last several months. Plaintiff anticipated that after the Fort Calhoun job was completed, he would move with the contractor to a series of similar jobs at other nuclear power plants. Thus, although plaintiff went to Omaha to work, the family home remained in Cheyenne. Plaintiff's wife, who remained at her job in Cheyenne, remained in the family home and could have been contacted at any time about his whereabouts. Shortly after plaintiff left the state, the State personnel department contacted him regarding another matter and he responded to that contact.

When plaintiff went to work at the Fort Calhoun Nuclear Power Plant he was employed by Bechtel Corporation under the terms of a union contract with Omaha Public Power District (OPPD), the owner of the power plant. Federal law requires that all persons maintain a nuclear security clearance in order to work at the facility. OPPD hired an in-

dependent contractor, U.S. Investigations, to do its background investigations. Within five days of his arrival, plaintiff received his initial clearance. However, as with all applicants, an in-depth investigation continued after he started work. U.S. Investigations contacted numerous private individuals, former co-workers and the Department regarding plaintiff. The Department personnel office and others all initially responded favorably and on March 13, 1998, the Department returned a form to U.S. Investigations stating that plaintiff was eligible for re-hire.

The week after plaintiff left, Ms. Wilson–McKee obtained access to his PC. She testified that she looked for the Hot Dog program and the two-page inventory and did not find them in the form she sought. She reported to her supervisor, defendant Robb, that she believed plaintiff had deleted files when he left and asked for assistance in determining if he had done so. It was arranged that Ms. Blair would search plaintiff's PC files.

Ms. Wilson–McKee did not ask plaintiff's co-worker who was also assigned to the Web page project if he had ever seen the Hot Dog program, if plaintiff had downloaded a copy, or even if the program was needed. Ms. Blair, who performed the search, knew at the time of the search that a copy of Hot Dog was otherwise available in the Department. Neither Ms. Wilson–McKee nor Ms. Blair looked at the back-up files sitting in plaintiff's desk when they searched for these files.

None of the defendants ever attempted to contact plaintiff to ask him about the allegation he had deleted files when he left.

The Department had back-up tapes for its server and eventually used those to restore the directories to the status of January and February 1998 and June, October and December 1997. The back-up tapes showed no evidence that the supposedly missing files had ever existed on plaintiff's PC.

In early April 1998, Ms. Wilson–McKee received one of U.S. Investigation's re-quests for information about plaintiff. When she received the request she had the use of the hard copy of the two-page inventory as obtained from Mr. Adams, the person in charge of the Department's entire inventory, who in turn had been given a copy by Mr. Pindell.

On or about April 24, 1998, Ms. Wilson–McKee, with the knowledge of and in consultation with defendants Robb and Green, sent a letter to U.S. Investigations Services. That letter stated:

> In response to your employment verification form pertaining to [plaintiff] I wish to comment on the inaccuracies of the information provided.
>
> Enclosed is a copy of a document all Archives employees read and sign as part of their employment agreement with this agency. Mr. Pindell signed a similar version of this document when he was initially employed. In 1997, with the assistance of the Attorney General's Office for the District of Wyoming, this document was revised to include the unlawful destruction of any information/records. On November 25, 1997, Mr. Pindell signed the revised document, agreeing to the terms of his employment set forth by this agency. It is believed that Mr. Pindell deleted computer records/documents from his office computer prior to his departure, which would be a violation of the agreement he signed.
>
> I would not consider the re-employment of Mr. Pindell under these circumstances.

Pl.'s Ex. D at 5136.

The policy referred to in the letter is the Archive's four-page Policy and Procedures on Unauthorized Release of Confidential Information and Unlawful Destruction of Records and Information. The policy covers "the maintenance of the confidentiality and security of the records entrusted to" the care of the Archives. Pl.'s Ex. D at 5137. The policy affords permanent state employees who are found to have violated the policy with the grievance and appeal

procedures found in Chapter 12 of the State of Wyoming Personnel Rules.

This Policy has not previously been applied to a state employee's work files kept on his or her PC. The Department also has a policy that generally covers retention of electronic information. That policy excludes electronic information from any retention requirements under either of the following situations: One, if a hard copy has been made. And two, if the electronic information was created over one year prior it may be destroyed at the discretion of the director "unless litigation is pending." Pl.'s Ex. F at 5006 and 5025.

In April or May of 1998, approximately one month after the back-up tapes showing plaintiff's directories were reinstalled, Ms. Blair deleted all of plaintiff's directories from the server. Ms. Blair testified that such files were not protected and it was not a violation of state policy to delete such material.

Along with her letter of May 4, Ms. Wilson–McKee also returned an employment verification form indicating that the information provided on the previous form returned by the Department was inaccurate and that she had information which would adversely reflect upon the reliability and trustworthiness of Mr. Pindell as it related to nuclear access—namely that he had deleted files in violation of policy.

As a direct result of the April 24, 1999, statements plaintiff was denied a security clearance and then immediately lost his job at the nuclear power plant. On May 1, 1998, plaintiff was at work at the Fort Calhoun plant when he was informed he had been denied a security clearance and armed security personnel removed him from the premises.

On May 4, 1998, OPPD sent plaintiff a certified letter stating:

> This is to advise you that you have been denied access to the Fort Calhoun Nuclear Power Station and to Safeguards Information. This decision was based upon information developed during your background investigation that indicates a lack of trustworthiness and reliability.

Pl.'s Ex. D.

The May 4, 1998 letter also informed plaintiff of his right to review of the decision to deny him a security clearance. Plaintiff arranged a review of the decision and immediately began to investigate the allegations. OPPD telephoned Ms. Wilson–McKee, who stated that all of the allegations could be proven.

Plaintiff began his efforts to clear his name. On May 5, 1999, plaintiff's attorney faxed the Wyoming Attorney General's Office a request for access to his file. In the early morning hours of the next day, between 3:00 and 3:30 a.m., plaintiff's computer files were accessed and modified. Defendants deny any knowledge of who accessed and modified the records which were in their custody and control.

Plaintiff's appeal of the denial of his security clearance was eventually denied. Defendants continue to refuse to withdraw Ms. Wilson–McKee's letter to OPPD or to provide plaintiff with a hearing in which he could clear his name. Plaintiff filed this case on January 12, 1999.

Plaintiff's evidence submitted in opposition to the motion is sufficient for a reasonable jury to find that the information in the April 24, 1998, letter is false, that Ms. Wilson McKee's letter was motivated by spite or ill-will and that she knew the information was false when she wrote the letter. His evidence, if believed, also shows the following: He never deleted files from his PC when he left his state employment. Ms. Wilson–McKee had a copy of the two-page inventory when she wrote the letter. Ms. Wilson–McKee knew when she wrote the letter that the inventory had been created over a year before plaintiff left the Department. Plaintiff never had a copy of the "Hot Dog" software on his PC. Defendant Wilson–McKee's and Ms. Blair's search method for the Hot Dog program avoided all of the likely sources for information of the

existence or whereabouts of such a file. For example, their search did not include contacting plaintiff himself, looking through his back-up files sitting in his desk drawer or asking his co-worker on the project for which the "Hot Dog" file was supposedly needed. The reinstalled old directories revealed that there never was a copy of the Hot Dog program in plaintiff's files. Plaintiff's files and directories were first altered and later destroyed while in defendants' control. Ms. Wilson–McKee was not happy that plaintiff left on short notice while she was in the midst of supervising a hectic and demanding move to a remodeled facility. Plaintiff lost his job and the opportunity for otherwise available and lucrative employment because he cannot obtain a security clearance for the sole reason of Ms. Wilson–McKee's letter. Plaintiff is foreclosed from even applying for a new security clearance for five years after the denial.

### III

Defendants have a different view of the facts. Defendants contend that Ms. Wilson–McKee needed the inventory for the move and that she became concerned when it did not appear in plaintiff's directory. Defendants contend their evidence shows that at the time of the letter they relied upon an investigation conducted by Management Information Systems (MIS) personnel which concluded that deletions had occurred. They contend that Ms. Wilson–McKee was concerned that in view of the seriousness of a security clearance granting access to a nuclear power plant she was concerned about liability if they did not provide complete and correct information. Defendants contend that they consulted with the Attorney General's Office before sending the letter. Defendants contend that Ms. Wilson–McKee's testimony is that she liked and got along with plaintiff and was motivated by duty rather than malice when she sent the letter.

### IV

The standard for consideration of a defendant's claim of qualified immunity is as follows:

> Qualified immunity protects public officials from individual liability in a § 1983 action unless the officials violated "clearly established ... constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Once a defendant to a § 1983 action raises a qualified immunity defense, the burden shifts to the plaintiff to show both facts and law to establish that the defendant is not entitled to a qualified immunity. *Dixon v. Richer,* 922 F.2d 1456, 1460 (10th Cir.1991). The plaintiff must "come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that law was clearly established when the alleged violation occurred." *Pueblo Neighborhood,* 847 F.2d at 646. If the plaintiff meets this burden, then the normal burden of the movant for a motion ... falls again upon the defendant. *See id.*

> Since [defendants] have raised the defense of qualified immunity, our analysis will focus on whether Captain Workman has met his burden of showing [defendants] violated a clearly established federal right. *See Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The ... federal rights involved in this case are deprivation of a property right without the due process of law [and] deprivation of a liberty right without the due process of law.... After examining each alleged constitutional violation separately, we conclude Captain Workman has failed to show [defendants] violated a clearly established federal constitutional right.

*Workman v. Jordan,* 32 F.3d 475, (10th Cir.1994) (*Workman II* ).

As governmental officials, [defendants] are entitled to assert a defense of qualified immunity:

> [g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Rozek v. Topolnicki,* 865 F.2d 1154, 1157 (10th Cir.1989).

The purpose served by the qualified immunity doctrine is that of protecting governmental officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority. *See Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 2910–11, 57 L.Ed.2d 895 (1978); *see also Sawyer v. County of Creek,* 908 F.2d 663, 665–67 (10th Cir. 1990).

\* \* \* \* \* \*

The question for the trial court to resolve is a legal one; the court cannot avoid the question by framing it as a factual issue. *Id.* The court's decision should identify the law upon which it relied and state the basis for its conclusion. *Id.* Because the doctrine of qualified immunity represents a balance that has been struck between competing values, *Harlow,* 457 U.S. at 813–15, 102 S.Ct. at 2735–37, the trial judge is burdened with a responsibility at an early stage, to make determinations of law based upon what the clearly established law governing the case was at the time of the challenged acts. Once the issue of qualified immunity is properly injected in the case, ... by a ... a motion for summary judgment, the plaintiff is obliged to present facts which if true would constitute a violation of clearly established law. *Dominque[ v. Telb],* 831 F.2d[ 673] at 677[ (6th Cir.1987)].

*Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 646 (10th Cir.1988) (emphasis added).

As to carrying the burden of convincing the court that the law was clearly established, "a plaintiff must do more than identify, in the abstract, a clearly established right and allege that the defendant has violated it." *Id.* at 645 (citing *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987)).

\* \* \* \* \* \*

The review this Court must employ, when a claim of qualified immunity is asserted at this stage in the proceedings, has been previously set forth. *See Sawyer v. County of Creek,* 908 F.2d 663, 665 (10th Cir.1990).

\* \* \* \* \* \*

In addition to coming forward with necessary factual allegations, the plaintiff must demonstrate that the right in question was clearly established at the time of defendant's conduct. *Pueblo Neighborhood,* 847 F.2d at 646. The Plaintiff cannot meet this burden merely by identifying a clearly established right and then alleging that the defendant violated it. The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Unless the plaintiff both demonstrates a clearly established right and comes forward with the necessary factual allegations, the "government official is properly spared the burden and expense of proceeding any further," *Powell,* 891 F.2d at 1457.

*Sawyer,* 908 F.2d at 666; *see also Hannula v. City of Lakewood,* 907 F.2d 129, 131 (10th Cir.1990) (to overcome defense of qualified immunity plaintiff must do more than identify a clearly established

legal test and then allege that the defendant has violated it).

*Gressley v. Deutsch,* 890 F.Supp. 1474, 1492–94 (D.Wyo.1994).

Thus, the issue before the court is whether plaintiff met his burden of showing that defendants violated a clearly established federal constitutional right, that the right in question was clearly established at the time of defendant's conduct and that the contours of the right were sufficiently clear that a reasonable official would understand that what he or she was doing violated that right.

Defendants contend that their conduct did not violate clearly established law, nor would a reasonable government official in their positions have known that their conduct violated a clearly established federal constitutional right. Defendants contend that plaintiff did not have a protected property or liberty interest in his employment with Bechtel or prospective employers in the nuclear industry, and even if he did, they contend that the State of Wyoming was not obligated to provide plaintiff with procedural due process prior to authoring the letter to U.S.I. Defendants therefore contend they are entitled to judgment under the doctrine of qualified immunity.

 This court must first establish whether plaintiff has established a constitutional right before delving into the qualified immunity analysis. *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

[Plaintiff] does have a liberty interest in his good name and reputation as it affects his protected property interest in continued employment. *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976); *McGhee v. Draper,* 639 F.2d 639, 643 (10th Cir.1981). However, Captain Workman must show how the government infringed upon this liberty interest. First, to be actionable, the statements must impugn the good name, reputation, honor, or integrity of the employee. *Board of Regents v. Roth,* 408 U.S. at 573, 92 S.Ct. at 2707.

Second, the statements must be false. *Codd v. Velger,* 429 U.S. 624, 628, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977); *Flanagan v. Munger,* 890 F.2d 1557, 1571–72 (10th Cir.1989); *Wulf v. City of Wichita,* 883 F.2d 842, 869 (10th Cir. 1989). Third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities. *Paul,* 424 U.S. at 710, 96 S.Ct. at 1165; *Sullivan v. Stark,* 808 F.2d 737, 739 (10th Cir.1987). And fourth, the statements must be published. *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976). These elements are not disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest. *See, e.g., Melton v. City of Oklahoma City,* 928 F.2d 920 (*en banc* ) (trial court erred in instructing jury to find either stigmatization or loss of employment opportunities), *cert. denied.*

*Workman II,* 32 F.3d at 481 (citations partially omitted).

These same elements as stated in *Workman* were adopted and quoted in a published opinion from this district, the *Gressley* case, *supra,* 890 F.Supp. at 1499.

 The employee need not prove actual denial of a job opportunity if the employee can prove termination based on published charge. *Melton,* 928 F.2d at 927 n. 11. However, "damage to prospective employment opportunities is too intangible to constitute a deprivation of a liberty ... interest." *Workman II,* 32 F.3d at 481 (quoting *Phelps v. Wichita Eagle–Beacon,* 886 F.2d 1262, 1269 (10th Cir.1989)). In *Phelps,* the court held that

[E]ven if defendants' action make plaintiff less attractive to employers or clients, that is insufficient to state a deprivation of a liberty or property interest under Section 1983. Rather plaintiff's status as lawyer and his existing legal rights must be significantly altered before a claim arises.

886 F.2d at 1269.

"Damage to one's reputation alone ... is not enough to implicate due process pro-

tections." *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1558 (10th Cir.1993). Among other requirements, the alleged stigmatization must harm some other interest, such as ... existing employment opportunities. *See Workman*, 32 F.3d at 481.

*Greene v. Barrett*, 174 F.3d 1136, 1141 (10th Cir.1999) (citations partially omitted).

To the extent that plaintiff relies upon the case *Corbitt v. Andersen*, 778 F.2d 1471 (10th Cir.1985), and cases citing *Corbitt* as establishing the standard regarding when a plaintiff shows a deprivation of a liberty interest, that case was subsequently severely limited by the Tenth Circuit, which thereafter limited *Corbitt* to its specific facts. *See Setliff v. Memorial Hospital of Sheridan*, 850 F.2d 1384, 1397 n. 18 (10th Cir.1988). Further, *Corbitt* predates *Siegert*, which has been the controlling law since 1991.

■ The clearly established law, from the U.S. Supreme Court and the Tenth Circuit Court of Appeals was summarized in *Gressley, supra*, a 1994 case published in this district and quoted above. Applying that clearly established law the court finds first, that the statements found in the April 24, 1998, letter impugn plaintiff's good name, reputation, and integrity of the employee. *See Roth*, 408 U.S. at 573, 92 S.Ct. 2701. The charge of deliberately deleting or destroying electronic files in direct violation of a known policy to the contrary is an allegation of such vandalism and vindictiveness as to alarm any prospective employer, much less employers burdened with the responsibilities inherent in security at nuclear power plants.

■ Second, the court finds that plaintiff has met his burden on summary judgment of producing substantial evidence that raises an issue of fact on whether Ms. Wilson–McKee's April 24, 1998, letter statements were false. *See Codd*, 97 S.Ct. 882.

■ The fourth element, publication is shown by plaintiff's evidence that the letter was sent to the investigative firm and eventually conveyed to his employer—all third parties to the relationship between plaintiff and defendants.

■ Where plaintiff's claim fails is that he has not alleged the third element, namely that the statements "occurred in the course of terminating the employee" although he does show that the statement "foreclose[d] other employment opportunities." *Workman II* (citing *Paul v. Davis*, 424 U.S. at 710, 96 S.Ct. 1155).

In *Paul*, the Supreme Court addressed the claims of an individual whose name and photograph appeared on a flyer captioned "Active Shoplifters" and distributed by police chiefs. His inclusion on the flyer resulted in his employer calling him in to ask about the flyer, hearing his side of the story and retaining him at this job with the condition that a similar incident did not occur. The Supreme Court applied its then-recent *Roth* decision as follows:

While *Roth* recognized that governmental action defaming an individual in the course of declining to rehire him could entitle the person to notice and an opportunity to be heard as to the defamation, its language is quite inconsistent with any notion that *a defamation perpetrated by a government official but unconnected with any refusal to rehire* would be actionable under the Fourteenth Amendment.

*Paul*, 96 S.Ct. at 1164 (underlined emphasis added).

Like the defamation in *Paul*, the alleged defamation in this case did not occur in connection with the termination of employment by the state official. Thus, this case is distinguishable from cases where the employee was allegedly stigmatized in the course of the state official's decision to terminate the employee's or the state actor's decision not to re-hire the employee and therefore the employee was entitled to an opportunity to clear his or her name.

The Supreme Court further clarified its *Roth* holding in subsequent cases, two of which have factual similarities to this case. In a § 1983 case, *Codd v. Velger*,

429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) the former employee of a city police department alleged that his city police department personnel file contained information—a suicide attempt—that the city police department later disclosed to his subsequent employer with the result that his subsequent employer, a railroad police department, then terminated his employment. However, in *Codd*, plaintiff had not alleged that the statement at issue was false.

The Supreme Court held in *Codd* that because the hearing required when an employee is stigmatized in the course of a decision to terminate his employment is required solely to provide an opportunity to clear the employee's name, where the employee did not challenge the substantial truth of the stigmatizing statements, no hearing was required because a hearing would not achieve the result of clearing the employee's name of the stigmatizing, but true, information. Because the Court found a hearing was not necessary, it found it unnecessary to reach the issue of whether the circumstances of its apparent dissemination were such as to fall within the language of *Roth*.

In 1991, in *Siegert v. Gilley, supra,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277, the Supreme Court squarely addressed the issue it had avoided earlier in *Codd.* The facts and procedural posture of the *Siegert* case are succinctly summarized in the syllabus prepared by the Supreme Court's Reporter of Decisions:

> In seeking to become "credentialed" in his new job at an Army hospital, petitioner Siegert, a clinical psychologist, asked his former employer, a federal hospital, to provide job performance and other information to his new employer. Respondent Gilley, Siegert's supervisor at his former job, responded with a letter declaring that he could not recommend Siegert because he was inept, unethical, and untrustworthy. After he was denied credentials and his federal service employment was terminated, Siegert filed a damages action against Gilley in the District Court, al-

leging, inter alia, that, under *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619[ (1971)], Gilley had caused an infringement of his "liberty interests" in violation of the Due Process Clause of the Fifth Amendment "by maliciously and in bad faith publishing a defamatory per se statement . . . which [he] knew to be untrue." Gilley filed a motion to dismiss or for summary judgment, asserting, among other things, the defense of qualified immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396, and contending that Siegert's factual allegations did not state the violation of any constitutional right "clearly established" at the time of the complained-of actions, *see id.,* at 818, 102 S.Ct. 2727.

500 U.S. at 226, 111 S.Ct. 1789.

*Siegert* involved federal rather than state officials and was therefore brought under *Bivens* rather than § 1983. However, *Siegert's* holdings on qualified immunity and the parameters of constitutionally protected liberty interest are equally applicable to § 1983 cases. *See Lancaster v. Independent School Dist. No. 5,* 149 F.3d 1228, 1235 (10th Cir.1998) (§ 1983 case applying *Siegert's* holding that injury to reputation alone is not a deprivation of a liberty interest protected by the federal constitution).

In *Siegert,* the Supreme Court, construing its earlier *Paul* and *Roth* held as follows:

> A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is "clearly established" at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all.

> \* \* \* \* \* \*

> This case demonstrates the desirability of this approach to a claim of immunity, for Siegert failed not only to allege the violation of a constitutional right

that was clearly established at the time of Gilley's actions, but also to establish the violation of any constitutional right at all.

In *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the plaintiff's photograph was included by local police chiefs in a "flyer" of "active shoplifters," after petitioner had been arrested for shoplifting. The shoplifting charge was eventually dismissed, and the plaintiff filed suit under 42 U.S.C. § 1983 against the police chiefs, alleging that the officials' actions inflicted a stigma to his reputation that would seriously impair his future employment opportunities, and thus deprived him under color of state law of liberty interests protected by the Fourteenth Amendment.

We rejected the plaintiff's claim, holding that injury to reputation by itself was not a "liberty" interest protected under the Fourteenth Amendment. 424 U.S., at 708–709, 96 S.Ct. 1155. We pointed out that our reference to a governmental employer stigmatizing an employee in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), was made in the context of the employer discharging or failing to rehire a plaintiff who claimed a liberty interest under the Fourteenth Amendment. Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation.

The facts alleged by Siegert cannot, in the light of our decision in *Paul v. Davis*, be held to state a claim for denial of a constitutional right. This is not a suit against the United States under the Federal Tort Claims Act—such a suit could not be brought, in the light of the exemption in that Act for claims based on defamation, *see* 28 U.S.C. § 2680(h)— but a suit against Siegert's superior at St. Elizabeth's Hospital. *The alleged defamation was not uttered incident to the termination of Siegert's employment by the hospital, since he voluntarily resigned from his position at the hospital,*

*and the letter was written several weeks later.* The statements contained in the letter would undoubtedly damage the reputation of one in his position, and impair his future employment prospects. But the plaintiff in *Paul v. Davis*, similarly alleged serious impairment of his future employment opportunities as well as other harm. Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation. But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a *Bivens* action. Siegert did assert a claim for defamation in this case, but made no allegations as to diversity of citizenship between himself and respondent.

The Court of Appeals assumed, without deciding, that if petitioner satisfactorily alleged that respondent's letter was written with malice, a constitutional claim would be stated. Siegert in this Court asserts that this assumption was correct—that if the defendant acted with malice in defaming him, what he describes as the "stigma plus" test of *Paul v. Davis* is met. Our decision in *Paul v. Davis* did not turn, however, on the state of mind of the defendant, but on the lack of any constitutional protection for the interest in reputation.

*Siegert*, 500 U.S. at 232–34, 111 S.Ct. 1789 (underlined emphasis added).

*Siegert*, with its closely similar facts, was the clearly established law at the times in question in this case. In this case, as in *Siegert*, the statement at issue was not uttered incident to plaintiff's termination but was issued several weeks later. The statement at issue in this case, as in the *Siegert* case, caused plaintiff to lose a prerequisite—in *Siegert* "credentials," in this case a security clearance— necessary for retaining an existing job. In both cases the plaintiffs had provisionally obtained the prerequisite but it was later

withdrawn solely because of the alleged defamatory statements. In both cases the inability to obtain the prerequisite barred the plaintiff from future jobs—in *Siegert*, plaintiff was turned down from one such future job and lost a second while he was appealing the denial of his credentials, a much stronger showing of impairment of future employment prospects than is shown in this case. Nonetheless, the Supreme Court held Mr. Siegert failed to show a violation of a constitutional right. Applying *Siegert*, this court must also find that plaintiff has failed to allege the violation of a constitutional right.

■ To the extent that plaintiff relies upon the case *Corbitt v. Andersen*, 778 F.2d 1471 (10th Cir.1985), and cases citing *Corbitt* as establishing the standard regarding when a plaintiff shows a deprivation of a liberty interest, *Siegert*, which has been the controlling law since 1991, clarifies that there is no constitutionally protected liberty in reputation where the alleged defamation is not "uttered incident" to plaintiff's termination or a refusal by the official in question to rehire the plaintiff. Further, as defendants point out, the precedential value of the *Corbitt* case was subsequently severely limited by the Tenth Circuit even prior to the *Siegert* case. *See Setliff v. Memorial Hospital of Sheridan*, 850 F.2d 1384, 1397 n. 18 (10th Cir.1988) ("we view *Corbitt* as perhaps extending the concept of a liberty interest to its maximum permissible limit.").

Thus, plaintiff appears to be in a Catch-22 situation. If defendants had terminated plaintiff's employment because of the allegation that he deleted files, plaintiff would likely have been entitled to a name-clearing hearing under *Roth* and/or under personnel policies for state employees. However, because the allegation was not made until weeks after he had voluntarily left state employment, the allegations were not uttered incident to his termination and he is not entitled to a *Roth* hearing or other procedural mechanism to clear his name from the stigma created by Ms. Wilson–McKee's April 24, 1998 letter. Although

the court is sympathetic to plaintiff's plight, this appears to be an ordinary defamation case and not a case of constitutional magnitude.

Under *Siegert*, this court holds that even viewing the facts most favorable to plaintiff, he has failed to show a claim for violation of a constitutionally protected liberty interest and therefore defendants are entitled to qualified immunity and summary judgment on plaintiff's liberty interest claim.

Plaintiff also contends that defendants' actions deprived him of his property interest in his job with Bechtel as well as his plans to follow Bechtel to a future series of such jobs. Plaintiff's deposition testimony is that he could be fired any time his employer felt it had cause, subject to the provisions of Bechtel's collective bargaining agreement with his union. Pl.'s Dep. at 68.

Defendants contend: (1) plaintiff did not have a property interest in his job, or in the expectation of such future jobs; (2) that even if he did, he was terminated by Bechtel and not by the defendant state officials; and, (3) that he received all the due process to which he was entitled when he appealed the denial of his security clearance.

It is important to distinguish between the defendants' alleged action and the effect of that alleged action. In this case the grant or denial of a security clearance was not in the control of the defendant state officials. Neither was the decision to hire, terminate or not to rehire plaintiff as a welder/pipefitter within the control of the defendant state officials. Thus, although it is undisputed that plaintiff lost his security clearance and his job because of Ms. Wilson–McKee's letter it is undisputed that defendants were not the persons responsible for the decision to deny him a security clearance and to terminate his employment with Bechtel.

■ An employee does not have a property interest in a security clearance

issued by the federal government. *Hill v. Department of Air Force*, 844 F.2d 1407, (10th Cir.1988) (individual does not have a constitutionally protected property or liberty interest in a security clearance which is merely temporary permission by the Executive Branch for access to national secrets) (citing *Dep't of Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988)) (federal courts have no authority to review the merits of the grant or denial of security clearances) *Accord Beattie v. U.S.*, 949 F.2d 1092 (10th Cir.1991).

In *Stehney v. Perry*, 101 F.3d 925 (3rd Cir.1996), the Third Circuit summed up the applicable law:

> In *Department of Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) the Supreme Court stated that "it should be obvious that no one has a 'right' to a security clearance." *Id.* at 528. Since that time, every court of appeals which has addressed the issue has ruled that *a person has no constitutionally protected* liberty or *property interest in a security clearance or a job requiring a security clearance. Jones v. Department of Navy*, 978 F.2d 1223, 1225–26 (Fed.Cir.1992); *Dorfmont v. Brown*, 913 F.2d 1399, 1403–04 (9th Cir. 1990); *Jamil v. Secretary, Dept. of Defense*, 910 F.2d 1203 (4th Cir.1990); *Doe v. Cheney*, 885 F.2d 898, 909–10 (D.C.Cir.1989); *Hill v. Department of Air Force*, 844 F.2d 1407, 1411 (10th Cir.1988).

101 F.3d at 936 (emphasis added).

To the extent that a private sector worker loses employment because of the revocation of a security pass or security clearance, that worker may be entitled to due process protections in connection with the denial. *See e.g. Cafeteria and Restaurant Workers Union, Local 473, AFL—CIO v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) *rev'd on other grounds, Board of Regents v. Roth*, 408 U.S. 564, 571 & n. 9, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (abandoning right/privilege distinction used in *Cafeteria Workers* ) and *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) (federal officials not empowered to deprive plaintiff of his job in a proceeding in which he was not afforded the safeguards of confrontation and cross-examination). However, to the extent that they are still good law, the *Cafeteria Workers* and *Greene* cases address the due process obligation of the persons or entity that controls the security clearance decision, and does not impose a due process obligation on all persons or entities that provide information for security clearance investigation.

Since *Egan* and *Hill* in 1988 the law has not been clearly established that a private sector worker has a constitutionally protected property interest in a security clearance necessary to retain an existing job at a federal facility.

Further, to the extent that defendant was entitled to due process in connection with denial of his security clearance, he has received that due process. In this case it was OPPD, the owner/operator of the power plant as overseen by the Nuclear Regulatory Commission, that was in charge of plaintiff's security clearance. As in *Hill,* there was a procedural mechanism for the plaintiff to appeal the denial of his security clearance with the entities that made the decision and the plaintiff used that mechanism.

Plaintiff has not shown he has a constitutionally protected property right in a security clearance necessary for an existing job and therefore he has not shown a violation of a constitutional right. Further, to the extent that there is a property right in a private sector job that requires such a security clearance, he has not shown that he was deprived of that job without due process and therefore has not shown a violation of a constitutional right. Further, even if there were a constitutionally protected property right in a job that required a security clearance plaintiff has not shown that defendants violated that right or that the way in which they are alleged to have violated it—by giving allegedly false information to security clearance

investigators, violated a right the contours of which were so sufficiently clear that a reasonable official would understand that what he or she is doing violates that right.

Accordingly, defendants are entitled to summary judgment on plaintiff's property right claim.

In conclusion, the court notes that the Supreme Court has emphasized many times that the defense of qualified immunity is a defense not only against having to stand trial, but also against having to face the other burdens of litigation—most notably discovery. *Siegert*, 500 U.S. at 232–33, 111 S.Ct. 1789 (quoting *Harlow*, 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396). The Court must then determine whether the complaint includes "all of the factual allegations necessary to sustain a conclusion that defendant violated clearly established law." *Powell v. Mikulecky*, 891 F.2d 1454, 1457 (10th Cir.1989). However, the issue in defendants claim of qualified immunity was not placed before this court prior to this summary judgment motion, filed near the close of the discovery deadline. Because the time for plaintiff's response fell after the discovery deadline, discovery was complete before this motion was submitted.

It is therefore

ORDERED that defendants' Motion for Summary Judgment on plaintiff's first cause of action under 42 U.S.C. § 1983 is GRANTED. As this order disposes of the only remaining claim in this case, the court will enter judgment in defendants' favor.